<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| THOMAS MUSTAFFA a/k/a ANDRE ROSE, | : : : : | |
| Petitioner, | : : | Civil Action No. 09-3296 (GEB) |
| v. | : : : | <u>**O P I N I O N**</u> |
| MICHELLE RICCI, et al., | : : | |
| Respondents. | : : | |

**BROWN**, Chief Judge:

Petitioner[1] filed a petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254(a) challenging a judgment of conviction rendered by the Superior Court of New Jersey, <u>see</u> Docket Entry No. 1, which petition, upon Petitioner's counsel appearance was superceded by Petitioner's application currently at bar ("Petition"). <u>See</u> Docket Entry No. 9. Respondents were directed to answer the Petition and duly complied, <u>see</u> Docket Entry No. 16, and Petitioner traversed. <u>See</u> Docket Entry No. 17.

For the reasons expressed below, the Court will dismiss the Petition and decline issuing a certificate of appealability. <u>See</u> 28 U.S.C. §§ 2253(c), 2254(a), (b) and (c).

---

[1] Petitioner's exact name is not entirely clear. Being prosecuted as "Andre Rose," <u>see</u>, e.g., <u>State v. Rose</u>, 2008 WL 2520836 (N.J. Super. App. Div. June 26, 2008), Petitioner is not known as such to the Department of Corrections ("DOC"). Rather, the DOC knows Petitioner as "Andre Thomas" or "Thomas Mustaffa" or "Mustaffa Walker," <u>see</u> <<https://www6.state.nj.us/DOC_Inmate/details?x=1010055&n=0>>, while Petitioner's counsel in this action refers to his client and "Mustaffa Thomas," <u>see</u> Docket Entry No. 9-1, at 1, and the transcripts of Petitioner's state proceedings indicate that Petitioner is known as "Mudree." <u>See id.</u> at 17.

# I.  STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982).  "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.  It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts. Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002). Where a federal claim was "adjudicated on the merits" [2] in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

---

[2] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever. Id.

Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable. Id. at 409-10.

A court begins the analysis by determining the relevant clearly established law. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

## II.  DISCUSSION

A.  **Parties' Positions**

Petitioner raised only one Ground in his Petition, reading as follows:

> [Petitioner] was denied his Sixth Amendment right to the effective assistance of counsel by his attorney's failure to present testimony in support of, and request a jury charge on, the lesser-included offense of passion-provocation manslaughter, . . . , while [conceding to] aggravated manslaughter as a lesser-included . . . offense.

Docket Entry No. 9-1, at 2.

In their answer, Respondents maintain that:

1. [While] Petitioner [is asserting that he] received effective assistance of counsel who portrayed the State's witnesses as untrustworthy liars[, Petitioner's c]ounsel reasonably did not pursue a passion-provocation defense because the [availability of the passion-provocation] defense [had] been undercut by . . . evidence depicting [the underlying homicide as an unprovoked, within the legal meaning of the defense,] execution-style murder[;]

2. Petitioner has procedurally defaulted on his ineffective assistance of counsel claim. The state court ruled [during post-conviction-relief proceedings] that the [P]etitioner was barred from raising the claim because it had been already litigated in the state court [during Petitioner's direct appeal;]

4

3.  Petitioner's petition should be dismissed because [P]etitioner can prove no set of facts establishing a violation of his constitutional rights[; and]

4.  Petitioner's application is time-barred.

Docket Entry No. 16-3.

Since the last three points raised by Respondents address issues other than Petitioner's single substantive challenge, it appears warranted to examine these three Respondents' points prior to turning to the facts and law of Petitioner's substantive claim.

**B.    Timeliness**

Respondents assert that Petitioner's statutory tolling was not triggered by Petitioner's post-conviction relief proceedings (and, thus, the Petition at hand must be deemed out of time) simply because the fact of Petitioner's filing of his pro se post-conviction relief ("PCR") application on February 5, 2003, was left unreflected in the computerized system maintained by the state courts. There is, however, no dispute that: (a) the Appellate Division itself noted that Petitioner's pro se PCR application was filed on February 5, 2003; and (b) such February 5, 2003, date renders Petitioner's instant Petition timely. These two facts conclude the Court's inquiry without further discussion, since the state courts, including the Appellate Division, are presumed to be both aware of and truthful about the dates and overall existence of the filings it receives (even when a certain entry is inadvertently omitted from its public-access computerized system), and the Court will not second-guess the Appellate Division's determinations that Petitioner's February 5, 2003, was actually made on that date and duly received by the state courts.

Consequently, for the purposes of this habeas review, the Petition is undoubtedly timely.

C.  **Procedural Default**

The record indicates that Petitioner challenged the performance of his trial counsel on direct appeal and – having that challenge dismissed on merits – tried, nonetheless, to re-raise the same during his PCR proceedings by creatively paraphrasing that challenge in hope of another bite at the apple. Since the challenge was substantively resolved during direct appellate review, it is hardly surprising that Petitioner's so-repackaged claim was dismissed by the state courts on procedural grounds during Petitioner's PCR proceedings.

From the fact of such PCR dismissal, Respondents now deduce that Petitioner's challenges must be procedurally barred for the purposes of *this Court's* habeas review. Petitioner, in his traverse, asserts that Petitioner's duplicative PCR challenge could not have procedurally defaulted his claim. Although Petitioner's analysis in that respect is as correct as it is lengthy, it is wholly unnecessary. Once a litigant fully exhausts a claim in state courts *on merits*, that claim cannot be procedurally defaulted for the purposes of *federal habeas review*, this is so regardless of whether or not it was re-raised and procedurally dismissed, as effectively duplicative, during later rounds of state proceedings. Therefore, Respondents' procedural default defense is facially inapposite to the case at bar and, hence, will not be entertained.

D.  **Failure to State a Claim**

Finally, Respondents assert that Petitioner "can prove no set of facts establishing a violation of his constitutional rights" and elaborate on this sentiment by maintaining that Petitioner asserted only errors of state law. This position is, seemingly, composed of: (a) the test articulated in now-archived Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (stating the no-longer-valid interpretation of Rule 8 pleading requirement, which – in any event – never applied to

habeas actions governed by the Habeas Rules); and (b) a point which was noted by this Court, in its "Standard of Review" section, supra, but which is wholly inapposite to the circumstances at bar. Indeed, here, Petitioner asserts, in no ambiguous terms, Sixth Amendment challenges against his trial counsel; such challenges squarely fall within the scope of habeas federal review and have nothing to do with state courts' errors in applying State's own law. In other words, while – as the discussion below illustrates – Petitioner has no *winning* federal claim, this substantive weakness of Petitioner's challenge cannot transform his claim into a state-law challenge escaping federal habeas review.[3]  Therefore, Respondents "failure-to-state-a-claim" defense will not be entertained, as facially inapposite to the case at bar.

E.    **Petitioner's *Strickland* Claim**

    1.    **Governing Legal Test**

The Sixth Amendment, applicable to the States through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. See Strickland, 466 U.S. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-89 ("Because of the difficulties inherent in making the evaluation, a

---

[3] Had it been otherwise, all losing federal habeas claims would invariably be dismissed as "state-law" claims, regardless of the federal nature of such losing challenges.

court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

      Then, the court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.[4]  See Strickland, 466 U.S. at 687-88.[5]

---

[4] The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

[5] To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695.  As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.

2.     **Facts Underlying Petitioner's Conviction**

Around 8:00 p.m. on June 8, 1998, two Newark police officers (Officer Jose Perez and Officer Anthony Wade) were dispatched to the location known as "222 Muhammad Ali Boulevard," where the Felix Fuld Housing Project (known, locally, as the "Little Bricks") is located. The officers were sent to investigate a report of a man with a gun, who was spotted near the Little Bricks.

As the officers approached the Little Bricks, they hears several gun shots and saw people running from the Project. When the officers drove into the Little Bricks, they saw a woman hiding behind a garbage container; the woman yelled to the officers, "They [are] shooting in the playground."

The officers drew their guns and ran toward the playground. When they entered the playground area, they saw two males standing over a motionless body lying on the ground. That body belonged to Jamil Billups, the victim. The officers saw one of the assailants, later identified as Petitioner, firing a round from his handgun into Billups' motionless body. The other assailant, later identified as Petitioner's co-defendant Kareem Wilson, stood next to Petitioner as this final shot was fired; Wilson, too, held a gun.

As the officers were running toward Petitioner and Wilson, they hears someone yelling "5-0,"[6] which brought the officers' presence to the assailants' attention. That caused Petitioner and Wilson to start running toward Rose Street. Officers Wade chased the assailants, while

---

[6] The phrase "5-0" is a slang expression, effectively operating as a warning that police are approaching; the phrase is derived from the name of a popular 1970's CBS television series "Hawaii 5-0," which featured work and life of a fictional police unit. See <<http://www.statemaster.com/encyclopedia/List-of-slang-terms-for-police-officers>>.

9

Officer Perez stopped to examine Billups. The victim appeared dead, and Officer Perez noted blood all over the area.

Meanwhile, Wilson managed to ran away, escaping the sight of Officer Wade, who followed Petitioner as Petitioner was running toward an area blocked by a large trash receptacle. When Officer Wade reached that trash receptacle, a Nissan 300-Z of cream/golden color drove from behind the receptacle into Rose Street, passing within six to seven feet of Officer Wade. The Nissan was driven by Petitioner, and he and Officer Wade faced each other through the open driver's window as the car drove by.

Meanwhile, emergency medical services were dispatch to attend Billups. Upon their arrival, the medical personnel determined that Billups had suffered eight gunshot wounds, the bulk of which were inflicted from a very close range, and that he died seemingly even before the help arrived. Seven vials of cocaine were found in Billups' pocket and a toy gun was found near his body; the toy was made to resemble a semi-automatic handgun.[7]

Upon the officers return to police headquarters, Officer Wade examined an array of photographs and identified Petitioner as the shooter and driver of the Nissan. A police investigation followed and resulted in the conclusion that Petitioner and Wilson were the persons who killed Billups; they both were arrested two months later in Florida. In the course of police

---

[7] There appears to be no dispute that both Petitioner and Billups were involved in illegal sale of controlled substances. Petitioner's position appears to be: (a) either that Billups were selling drugs for Petitioner (and, two weeks prior to the shooting, pocketed the proceeds instead of paying Petitioner his share) and/or that, two weeks prior to the shooting, Billups stole $8,500 worth of heroin and some cash from Petitioner by other means; and (b) Billups analogously "misappropriated" sale proceeds and/or stole by other means from other drug dealers, one of whom might have been Wilson. It is unclear from the underlying record whether the state courts made a factual finding as to the veracity of this position. However, out of abundance of caution, this Court takes Petitioner's position as true for the purposes of its habeas analysis at hand.

investigation, four eye-witnesses of the murder were presented with arrays of photographs and identified Petitioner and Wilson as the persons involved in Billups' murder; these witnesses gave their formal statements shortly after the homicide.  Each statement identified Petitioner as the shooter, although one witness stated that Wilson also shot at Billups.  Prior to trial, all these witnesses recanted their statements denying that they saw the shooting.  However, after four separate hearings (conducted by Petitioner's trial judge pursuant to State v. Gross, 121 N.J. 18 (1990)), Petitioner's trial court determine that the recanted statement were sufficiently reliable to be admitted into evidence.  The verdict indicates that the jurors found these statements credible.

  According to these statements, Michelle Jenkins (a/k/a April Michelle Smith), who knew Petitioner and Wilson for years, first observed an argument between Petitioner and Billups and then observed that, after leaving for a few minutes, Petitioner returned – this time together with Wilson – to pull out a gun and to start shooting at the victim.

  Keitha Jefferson, who also knew Petitioner and Wilson for years, stated that she saw Petitioner standing over the victim and shooting, while Wilson kicked the victim in the face. Jefferson stated that she heard a lot of shots and began running after the initial shots were fired.

  LaVonda Greene (a/k/a Gumba) also knew Petitioner all her life, and she knew both Wilson and Billups for years.  On the evening of the homicide, Green heard the shots, which caused Greene to ran to the playground looking for her three children.  Consequently, Greene witnessed Petitioner shooting Billups a few times, while the victim was on the ground, and Petitioner and Wilson were standing over the victim's body.  Green also stated that, after that initial round of shooting, Petitioner and Wilson started to walk away, and then they noticed that

the victim's feet moved and returned to Billups. Upon that return, Petitioner shot the victim again, while Wilson kicked Billups' body.

Aaron Johnson contacted police two months after the homicide; at the time of his contact, Johnson was incarcerated on unrelated charges. Johnson, too, stated that Petitioner and Wilson stood over Bulliops' body stretched before them on the ground, and Petitioner was shooting at the victim. In addition, Johnson stated that Wilson, too, was shooting at Billups; according to Johnson, Wilson was shooting during the period when Petitioner's gun was jammed.

Johnson also detailed that, once Petitioner unjammed his gun, he reached down and grabbed the victim by his hair, pointed his gun at the victim's head and shot Billups after telling the victim, "See [expletives], what I tell you!" and hearing Billups' pitiful plea, "Don't kill me!"[8]

Moreover, Johnson stated that, prior to the homicide, Petitioner had been persistently searching for the victim; such search, apparently went on for days and, during that search, Petitioner asked Johnson, twice, on two different days, whether Johnson had seen Billups. In the course of his inquiry with Johnson, Petitioner had indicated that he was seeking to revenge Billups for drugs and cash stolen by Billups from Petitioner two weeks prior.

Since Petitioner was a drug dealer with prior criminal record, the state courts found that it was a good defense strategy to keep Petitioner's drug dealing past away from the jurors and – accordingly – that it was reasonable to for Petitioner's counsel to advise his client not to testify/assert a passion-provoked manslaughter because, in order to do so, Petitioner would have

---

[8] At the time of the homicide, Johnson was seemingly located within an audible distance.

to admit that he actually shot Billups, and the jury would be allowed to learn that Petitioner was a drug dealer with prior convictions.[9]

### 3. Petitioner's Substantive Challenge

Petitioner's single Ground is marked by one prevailing theme. Specifically, Petitioner argues that the homicide should have been presented to the jurors as a provoked manslaughter, and all arguments of his defense attorney should have been aligned accordingly.[10] In connection with this position, Petitioner asserts that his defense counsel's "all or nothing" strategy (based, effectively, on the assertion that the State's witnesses were lying, and Petitioner was innocent) violated Petitioner's Sixth Amendment rights.[11] Elaborating on these allegations, Petitioner maintains that his counsel unduly agreed to the trial judge's inclusion of aggravated manslaughter charge in the jury instructions; Petitioner believes that such instructions had to be taken out and substituted by passion-provocation instructions.[12]

---

[9] Petitioners' submissions at no point indicate or even suggest that Petitioner waived his right to testify at trial due to any undue influences and/or without informed consent on his part.

[10] In the course of Petitioner's PCR hearings, Petitioner's counsel testified that he raised the issue of him fostering the theory of passion-provocation manslaughter to Petitioner's trial judge, but the judge noted that such theory was unwarranted because Petitioner's case did not have factual evidence supporting such position.

[11] During Petitioner's PCR proceedings, Petitioner's defense counsel testified that he discussed such "all or nothing" strategy with Petitioner and, from Petitioner's response, developed an impression that Petitioner was in favor of such choice.

[12] While the term "passion-provocation" manslaughter has been frequently repeated in Petitioner's submissions, these submissions fail to clearly define what exactly were the events that allegedly provoked Petitioner to shoot Billups. It appears that Petitioner initially conflated two events/emotions: (1) Billups' alleged theft of heroin from Petitioner two weeks prior to the homicide, see this Opinion, note 7; and (2) Petitioner's alleged fear that Billups would try to rob/shoot him with a (toy) gun during Petitioner's encounter with Billups at the playground on the
(continued...)

**4.     Analysis**

Petitioner's position, as it appears after Petitioner's traverse, is that inclusion of the aggravated manslaughter language into the jury charge stripped Petitioner from an opportunity to assert an imperfect self-defense position, while inclusion of provocation instructions would have preserved such opportunity and – if accompanied with corresponding trial strategy of his defense attorney – could have yielded a different outcome of Petitioner's trial.[13]

That assertion is without merit. To the degree Petitioner wishes to assert that he was harmed by inclusion of aggravated manslaughter charge in the jury instructions, Petitioner's position is divorced from the facts of his conviction, since Petitioner was not convicted on the grounds of that alternative, lesser-included, offense. To the degree Petitioner asserts that the aggravated manslaughter charge prevented the jury from considering Petitioner's "imperfect self-defense," Petitioner's position is divorced from law of Petitioner's conviction, since Petitioner could, just as well, present his "imperfect self-defense" for the purposes of aggravated manslaughter charge. See State v. Pitts, 116 N.J. 580 (1989) (explaining, in great detail, why an imperfect-self-defense position is wholly compatible with – and even calls for – the charge of

---

[12](...continued)
date of the homicide. See generally, Docket Entry No. 9-1. In his traverse, Petitioner abandoned the first part of his claim, reducing his position to a challenge that his counsel violated his Sixth Amendments rights by not fostering Petitioner's "imperfect self-defense." See Docket Entry No. 17, at 10-11 ("[P]etitioner did not claim that the shooting occurred because Billups had stolen drugs from him two weeks earlier; [P]etitioner testified [during his PCR proceedings] that he shot Billups after, [as Petitioner now maintains,] Billups approached him and attempted to rob him [and] showed [P]etitioner what appeared to be a gun and threatened to use it").

[13] Petitioner's trial judge charged the jurors about the elements of murder, aggravated manslaughter, reckless manslaughter and assault. See Docket Entry No. 16-12. Petitioner's challenges seem to be limited solely to the aggravated manslaughter charge.

aggravated manslaughter). Therefore, Petitioner's position that his counsel had to demand a diminished capacity charge in the form of a passion-provocation instruction and had no basis to agree to an aggravated manslaughter instructions is without merit.

That leaves this Court with Petitioner's umbrella claim, i.e., that it was unreasonable for Petitioner's counsel not to pursue an "imperfect self-defense" strategy. This claim is, however, wholly without merit.

It is trite to repeat that, under New Jersey state law,

> [p]assion/provocation manslaughter has four elements: the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying. The first two criteria are objective, the other two subjective.

State v. Mauricio, 117 N.J. 402, 411 (1990) (citation to a treatise omitted).

Perhaps because Respondents numerously highlighted the fact that Billups was shot eight times, Petitioner capitalized on these numerous references by asserting that this fact, in and by itself, is insufficient to establish lack of circumstances compatible with a provocation manslaughter. Petitioner, however, missed Respondents' key point: it is not the fact that Bullps suffered eight wounds that rendered resort to a provocation-based theory unwarranted in Petitioner's case, it is the *entirety* of circumstances of Billups' murder that rendered this theory unwarranted: because these circumstances painted an execution-style, cold-blooded slaughter of Billups that had nothing to do with a provocation-based self-defense.

Here, Petitioner concedes that he "cooled off" during the two weeks that expired between Billups' alleged theft of heroin from Petitioner and the homicide. Petitioner now asserts only that, on the day of the homicide, he was "provoked" by the imminent threat of robbery on the

15

part of Billups, and by Petitioner's fear that Billups would use Billups' – as it turned out, toy – gun to shoot Petitioner during such hypothetically imminent robbery.[14]

However, these allegations cannot be squared with the evidence admitted by Petitioner's trial judge – and found credible by Petitioner's jurors – during Petitioner's trial.[15] As the witnesses' statements indicated, Petitioner was neither accosted/threatened by Billups with a threat of robbery/shooting on the day of the homicide: rather, it was Petitioner who spent days relentlessly seeking to accost and revenge Billups for the allegedly stolen heroin/cash.

Moreover, once Petitioner found Billups, the two had an argument the result of which did not threaten Petitioner with any immediate robbery, physical injury or any other form of harm: indeed, Petitioner does not dispute that, after the argument, he retreated being wholly unharmed, not robbed and not even followed by Billups. He, however, *elected to return* and confront

---

[14] Petitioner's submissions contain a lament about redaction of those parts of witnesses' statement, which indicated that Billups might have stolen heroin/cash from Petitioner two weeks prior to the homicide. However, since Petitioner concedes that this two-week gap between the theft and the murder rendered the theft an occurrence unsuitable to operate as a "provocation" for the purposes of the homicide, the redacted parts of witnesses' statements were either: (a) wholly irrelevant to Petitioner's self-defense position (because the *only* person who could make a statement about Billups' alleged threat to rob/shoot Petitioner on the day of the homicide was *solely* Petitioner, himself, since Petitioner invariably maintained that Billups made such robbery/ shooting threats to Petitioner in a tete-a-tete conversation, and so no witness could testify to the content of *that* exchange); or (b) outright unfavorable to Petitioner, since these redacted parts of witnesses' statements, had they been introduced, would have spelled out Petitioner's motif to search for Billups with the goal to execute him, in cold blood, in revenge for the theft.

[15] The Court notes, in passing, that Petitioner's position that Billups' alleged theft from Petitioner two weeks prior was a supporting factor in Petitioner's fear for his life on the day of the homicide lacks any logic: if one is to presume that Petitioner could draw on his own experience with Billups for the purposes of selecting course of action on the day of the homicide, than Petitioner's experience should have advocated in favor of Petitioner's physical safety, since it appears to be no dispute that Billups' alleged theft of heroin from Petitioner two weeks prior to the homicide, even if it actually took place, left Petitioner absolutely unharmed physically.

16

Billups again, just a few minutes later: when Petitioner returned with Wilson to execute Billups. Petitioner's unrestrained retreat and his voluntary return operate, in and by themselves, as acts wholly incompatible with Petitioner's claim about his fear of being robbed/shot by Billups.[16]

Furthermore, while allegedly being in deathly fear of Billups, according to the testimony accepted by the jury, Petitioner not only shot Billups upon returning and bringing Wilson to assist in the shooting: Petitioner *kept* shooting at Billups' helpless body, which was stretched at his feet.  Finally – upon leaving the second time around and noting, in the process of that second departure, that a shred of life still remained in the victim's body (because Billups' feet moved), Petitioner returned once again: for another round of shooting, during which he indulged in the act of uttering a line into the victim's face and murdering him after extracting Billups' pitiful plea for life.

This chain of actions is wholly incompatible with the shooting a provoked person might engage in self-defense out of fear of being robbed/shot.[17]  In light of the foregoing, Petitioner's

---

[16] See, e.g., 40 Am. Jur. 2d, Homicide § 48 (explaining that provocation has to be "reasonable"); see also Mauricio, 117 N.J. at 411 (the "provocation" must be *objectively reasonable)*; accord N.J. Stat. Ann. 2C:3-4(b)(2) (use of "deadly force" is only justifiable when "the actor reasonably believes that such force is necessary to protect himself against death or serious bodily injury"); State v. Kelly, 97 N.J. 178, 198-200 (1984) (to justify the use of force in self-defense, the actor must have an actual "honest" belief in the necessity of using force and that belief must be "reasonable" in light of the circumstances existing at the time of the homicide)

[17] Therefore, in the event the Court is to presume true Petitioner's defense counsel's recollection of Petitioner's trial judge's conclusion that Petitioner's case lacked factual predicate for passion-provocation manslaughter, this Court was not presented with clear and convincing evidence to offset Petitioner's trial court's factual finding, see Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001)  (presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence) (citing 28 U.S.C. § 2254(e)(1)), which, in turn, caused Petitioner's counsel's  not unreasonable compliance.

counsel's strategic choice not to pursue a likely incredulous self-defense theory (and not to seek inclusion of a passion-provocation charge in the jury instructions) appears not unreasonable.

Therefore, Petitioner's challenges fail to meet even the first test of Strickland. See Thomas 428 F. 3d at 499 ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either . . . that the actions could never be considered part of a sound strategy"). Moreover, in the event this Court were to assess Petitioner's claims in light of the second prong of Strickland, Petitioner's claims must, too, be dismissed since, to satisfy the prejudice prong, Petitioner must show that there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt with respect to Petitioner's guilt, see Strickland, 466 U.S. at 695, but – here – the record unambiguously establishes lack of such reasonable probability.

Therefore, Petitioner's Strickland claim is wholly without merit and will be dismissed.

### III.  CERTIFICATE OF APPEALABILITY

The Court denies a certificate of appealability because Petitioner has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2). See Miller-El v. Cockrell, 537 U.S. 322 (2003).

### IV.  CONCLUSION

Based on the foregoing, the Court dismisses the Petition with prejudice and declines to issue a certificate of appealability under 28 U.S.C. § 2253(c).

/s/ Garrett E. Brown, Jr.  
**Garrett E. Brown, Jr.**  
**Chief Judge**  
**United States District Court**

Dated: April 25, 2011